ST. PAUL MERCURY INSURANCE
COMPANY, Plaintiff

v.

DUKE UNIVERSITY, Leonard R.
Prosnitz and Raymond U,
Defendants.

No. C–86–959–D.

United States District Court,
M.D. North Carolina,
Durham Division.

Oct. 2, 1987.

Joseph W. Yates, III and Barbara B. Weyher of the firm Yates, Fleishman, McLamb & Weyher, Raleigh, N.C., for plaintiff.

Laura B. Luger of the firm Moore & VanAllen, Charles A. Bentley, Jr. and Robert B. Glenn, Jr. of the firm Glenn & Bentley, P.A., David B. Adcock, Duke University, Associate University Counsel, Durham, N.C., Carl W. Vogt and Robert A. Burgoyne of the firm Fulbright & Jaworski, Washington, D.C., for defendants.

MEMORANDUM OPINION
AND ORDER

HIRAM H. WARD, Chief Judge.

This matter comes before the Court on cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  Plaintiff's declaratory judgment action involves questions of law regarding the scope of the coverage of the insurance contract at issue and the public policy of North Carolina.  Although finding that the insuring language of the contract provides coverage for liability arising from punitive damage awards, the Court will grant summary judgment in favor of plaintiff, finding that the public policy of North Carolina precludes coverage of punitive damages awards arising from intentional torts and that the contract fails to provide coverage for employees of the insured with

---

1. Specifically, defendants raised the issues involved in this matter in Motion of Defendants Duke University and Leonard R. Prosnitz for Partial Summary Judgment (June 17, 1987). Similarly, the same issues were raised by Plaintiff's Motion for Summary Judgment (June 17, 1987).

regard to personal injury claims brought by fellow employees.

## FACTS

The plaintiff is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. Defendant Duke University is a nonprofit corporation with its principal place of business in Durham, North Carolina. Defendant Leonard R. Prosnitz is a medical doctor employed by defendant Duke. Defendant Raymond U is a medical doctor now residing in Virginia who was employed by defendant Duke at all times relevant to this matter.

In or around March 1983, a machine known as a "Thermotron" was shipped to the United States and installed at Duke University Medical Center. The Thermotron, which is used in cancer research and experimental therapy, had been manufactured in Japan. Sometime thereafter, a dispute arose regarding the ownership of, access to, and use of the machine. While Dr. U maintained that the Japanese manufacturer retained ownership and permitted the installation and use of the Thermotron subject to his supervision and control, other employees contended that the machine was a *gift* without any restriction on its use.

In late March or early April 1984, Dr. U removed certain parts and equipment from the machine in order to prevent its use by other Duke employees. In response, Duke obtained a temporary restraining order in state court on April 4 requiring Dr. U to return the parts and equipment he had removed. On July 18, 1984, Duke voluntarily dismissed the action based upon a consent agreement regarding the machine's future ownership, use, and control.

On October 3, 1984, Dr. U filed an action in the Superior Court of Durham County, North Carolina, alleging various causes of action against Duke and its employees as to the use of the machine. On September 19, 1986, the jury awarded Dr. U $30,000 in

compensatory damages and $1,000,000 in punitive damages on his malicious prosecution claim against Duke. In addition, the jury awarded $50,000 in compensatory damages and $50,000 in punitive damages to Dr. U on his libel and slander claim against defendant Prosnitz. Finally, the jury awarded Dr. U $1 in compensatory damages on his conversion claim against defendants Prosnitz and Duke.[2]

Following the jury's verdict in the case, defendants Prosnitz and Duke filed a claim with plaintiff for coverage of all of their damages, pursuant to Policy No. 632NA7554. *See* (Attachment A), *attached to* (Joint Stipulation of Facts). By letter of counsel dated December 16, 1986, plaintiff advised defendants that it would assume responsibility *only* for the compensatory damages awarded against Duke for malicious prosecution.[3] *See* (Attachment F). In other words, plaintiff expressly *denied* coverage for punitive damages as to both defendants and for *all* of the damages awarded against Prosnitz.

In order to resolve the questions of coverage raised by its position, plaintiff filed this declaratory judgment action in United States District Court for the Middle District of North Carolina on December 15, 1986. Following a stipulation of facts filed May 22, 1987, both plaintiff and defendants filed motions for summary judgment as to the scope of the coverage of the insurance policy and as to the relevant public policy of North Carolina. Having been briefed and argued in open court, the motions are now ready for ruling.

## DISCUSSION

As stated above, this matter raises three issues for resolution by the Court. First, does the insurance policy involved provide coverage of the awards against defendant Prosnitz? Second, does the clause of the insurance policy providing coverage of

2. In addition, the jury awarded Dr. U $60,000 on his civil conspiracy claim against defendant Prosnitz and Dr. Mark J. Engler. However, the trial judge set aside that part of the verdict, pursuant to N.C.R.Civ.P. 50. *See* (Attachment E at 4).

3. Hence, the Court is not faced with the issue of whether insuring against liability for damages awarded as *compensation* for an intentional tort violated public policy.

awards include those representing punitive damages? Third, if punitive damage awards are included, does the public policy of North Carolina preclude as a matter of law coverage of punitive damages arising from intentional torts?

In construing the language of insurance policies, the Supreme Court of North Carolina has generally turned to the guidance of Justice Lake. Basically, "nontechnical words, not defined in the policy, are to be given the same meaning they usually receive in ordinary speech, unless the context requires otherwise." *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978) (citations omitted). Thus, absent any ambiguity in the language used, "the courts must enforce the contract as the parties have made it and may not impose liability upon the company which it did not assume and for which the policyholder did not pay." *Id.*

Generally, "a contract of insurance should be given that construction which a *reasonable person* in the position of the insured would have understood it to mean...." *Id.* (emphasis added). However, language that is reasonably susceptible to different constructions "must be given the construction *most favorable* to the *insured*, since the company prepared the policy and chose the language." *Id.* (emphasis added). Hence, "[i]f any ambiguity exists in the insurance contract ..., the fault lies with the insurance company and not with the insured." *Mazza v. Medical Mut. Ins. Co.*, 311 N.C. 621, 630, 319 S.E.2d 217, 223 (1984).

## I.

█ In the policy before the Court, plaintiff states: "Your employees are protected while they are working for you *within the scope of their duties*." (General Liability Broadening Endorsement at 4) (emphasis added). On the other hand, the policy states: "We *won't* cover your employees for ... [*inter alia*] [c]laims for ... personal injury to a fellow employee occurring *on the job*." (*Id.*) (emphasis added). Hence, Dr. U's claims against Prosnitz fail to fall within the terms of the policy for two rea-

sons. First, Prosnitz's commission of defamation was *not* "within the scope of [his] duties." Second, an explicit provision elsewhere in the policy specifically excludes coverage of such claims.

Generally, the term "within the scope of their duties" requires that one's injuries result from another's action within the natural course of his employment responsibilities. In this case, defendant Prosnitz was *not* a spokesman for the hospital; he was a physician. Therefore, the slanderous statements uttered about Dr. U did not occur within the natural course of his employment responsibilities. The facts that Prosnitz and U worked together and that Prosnitz defamed U's character and reputation during working hours are *not* sufficient to bring the claim within the plain and ordinary meaning of the provision.

In addition, the specific exclusion of personal injury claims involving a fellow employee precludes coverage of Prosnitz's liability. A subsequent endorsement "expand[ed] coverage under [Duke's] Comprehensive General Liability Protection agreement to cover *bodily injury claims* brought against employees by their fellow employees." (Fellow Employee Protection Endorsement) (emphasis added). However, the endorsement specifically limited itself to "*bodily injury claims.*" Hence, personal injury claims such as libel and slander remain excluded.

Defendant argues that other language in the endorsement operates to delete the exclusion of *all* fellow employee claims. *See* (Memorandum in Support of the Motion of Defendants Duke University & Leonard R. Prosnitz for Partial Summary Judgment at 36). However, this language merely operates to delete that part of the exclusion described above. In other words, the more general language deleting the fellow employee exclusion operates merely to delete bodily injury claims in accordance with and to confirm the description of the endorsement's effect.

To summarize, Prosnitz's liability for defamation is *not* within the coverage of the insuring clause, *is* within the scope of the fellow employee exclusion, and is *not* with-

in the coverage of the endorsement which only affected *bodily* injury claims. Therefore, plaintiff, the insurer, is not liable for *any* damages arising from Dr. U's defamation claim against Prosnitz. Accordingly, the Court will grant summary judgment in favor of plaintiff on this issue.

## II.

██ The Court now turns to the issue whether coverage of punitive damages is within the insuring language of the policy. Specifically, the policy states: "We'll pay amounts you and others protected under this endorsement are legally required to pay as *damages* for covered ... personal injury claims." (General Liability Broadening Endorsement at 1) (emphasis added). Moreover, the policy specifically includes within the definition of "personal injury" claims of malicious prosecution and of libel and slander. (*Id.*) Thus, the policy covers the types of claims which were made against Duke and Prosnitz.[4] Therefore, the initial question becomes whether the *language* of the specific clause providing such coverage includes awards of punitive damages in addition to those representing compensatory damages.[5]

Plaintiff relies on two courts of appeals decisions from North Carolina and Missouri to support its argument that the plain language of the policy does not cover punitive damages claims. *See* (Plaintiff's Brief in Support of Its Motion for Summary Judgment 9–12) (citing *Cavin's Inc. v. Atlantic Mut. Ins. Co.,* 27 N.C.App. 698, 220 S.E.2d 403 (1975); *Schnuck Markets, Inc. v. Transamerica Ins. Co.,* 652 S.W.2d 206 (Mo.Ct.App.1983)).[6] However, these decisions were prior to the recent pronouncement of the North Carolina Supreme Court that "[i]f the insurance carrier to this insurance contract intended to eliminate coverage for punitive damages it could and should have inserted a single provision stating 'this policy does not include recovery for punitive damages.'" *Mazza,* 311 N.C. at 630, 319 S.E.2d at 223. Accordingly, in holding that the policy at issue encompassed claims for exemplary awards, the *Mazza* court "place[d] *great emphasis* on the fact that there is *no specific exclusion* in the insurance contract for punitive damages." *Id.* (emphasis added).

Similarly, this Court places great emphasis on the fact that there is no specific exclusion of punitive damages in the insurance contract in this case. Like the terms of the policy in *Mazza,* "the language used in the present insurance contract is so broad that it must be interpreted to provide coverage for punitive damages...." *Id.* at 628–29, 319 S.E.2d at 222. Therefore, in accordance with well established rules of construction, the Court will construe the contract before it liberally in favor of the insured and strictly against the insurer, "since the insurance company selected the language used in the policy." *Id.* at 631, 319 S.E.2d at 223 (citing 43 Am.Jur.2d *Insurance* § 272 (1982); 7 Strong's N.C.Index 3d *Insurance* § 6.3 (1977)).[7]

---

**4.** The Court has already discussed that plaintiff is not liable on the defamation claim against Prosnitz; however, the discussion in this section and more importantly in the next section provides a compelling additional reason why plaintiff is not liable for the punitive damage award against Prosnitz.

**5.** At this point, the Court would specifically note that its resolution of the public policy question in favor of plaintiff renders this issue moot. However, for the reasons stated, the Court believes assuming coverage without deciding the issue would ignore the holding in *Mazza.* Accordingly, the Court will resolve this issue.

**6.** *See also Ging v. American Liberty Ins. Co.,* 293 F.Supp. 756 (N.D.Fla.1968), *rev'd on other grounds,* 423 F.2d 115 (5th Cir.1970); *Gleason v. Fryer,* 30 Colo.App. 106, 491 P.2d 85 (1971) (fol-

lowing *Universal Indem. Ins. Co. v. Tenery,* 96 Colo. 10, 39 P.2d 776 (1934)); *Tedesco v. Maryland Casualty Ins. Co.,* 127 Conn. 533, 18 A.2d 357 (1941); *Caspersen v. Webber,* 298 Minn. 93, 213 N.W.2d 327 (1973); *Nationwide Mut. Ins. Co. v. Knight,* 34 N.C.App. 96, 237 S.E.2d 341, *disc. rev. denied,* 293 N.C. 589, 239 S.E.2d 263 (1977).

**7.** The Court would also note that a federal court sitting in diversity is "free to disregard ... a [lower state court] decision when it appears to be an aberration and [it is] convinced that the [supreme court of the state] would not embrace it." *Klippel v. U-Haul Co.,* 759 F.2d 1176, 1181 (4th Cir.1985). Moreover, in addition to clearly distinguishing *Cavin's,* the *Mazza* court specifically noted that "precedents set by the Court of Appeals are *not* binding on this Court." *Mazza,*

Many courts have held similar clauses to unambiguously include coverage of punitive damage awards.[8] Others have considered such clauses ambiguous but governed by the principle of *contra proferentum*.[9] In such a case, the perceived ambiguities are construed against the insurer who drafted the policy. *Schnuck Markets*, 652 S.W.2d at 210.[10] Thus, the language of the clause before the Court includes the punitive damages awards upon *either* of these two bases.

The Court finds the cases upon which plaintiff relies to be unpersuasive in light of the language in *Mazza*. Therefore, whether the Court finds that the language unambiguously includes coverage of punitive damage awards or whether it concludes that the language is ambiguous but controlled by the doctrine of *contra proferentum*, the same result occurs. In any event, this issue is mooted by the Court's holding on the public policy question. Hence, since the language used is general and broad, with no specific exclusionary clause, the Court will consider the terms to include on their face awards representing punitive damages.[11]

### III.

■ The final issue before the Court involves whether despite the clause discussed *supra* the public policy of North Carolina precludes coverage of punitive damages awarded for intentional torts as a matter of law.[12] The *Mazza* court held that punitive

---

311 N.C. at 631, 319 S.E.2d at 223 (emphasis added). Similarly, *Cavin's* is not binding on *this* Court as a federal court sitting in diversity based on the belief that, in light of *Mazza*, the North Carolina Supreme Court would uphold coverage of punitive damages awards in this case.

**8.** *See, e.g., Ridgway v. Gulf Life Ins. Co.*, 578 F.2d 1026, *reh'g denied*, 583 F.2d 541 (5th Cir. 1978) (applying Texas law); *Pennsylvania Thresh. & Farmers' Mut. Casualty Ins. Co. v. Thornton*, 244 F.2d 823 (4th Cir.1957) (applying South Carolina law); *Ohio Casualty Ins. Co. v. Welfare Fin. Co.*, 75 F.2d 58 (8th Cir.1934), *cert. denied*, 295 U.S. 734, 55 S.Ct. 645, 79 L.Ed. 1682 (1935) (applying Missouri law); *Harris v. County of Racine*, 512 F.Supp. 1273 (E.D.Wis.1981); *Grant v. North River Ins. Co.*, 453 F.Supp. 1361 (N.D.Ind.1978); *Fagot v. Ciravola*, 445 F.Supp. 342 (E.D.La.1978); *Concord Gen. Mut. Ins. Co. v. Hills*, 345 F.Supp. 1090 (D.Me.1972); *State Farm Mut. Auto. Ins. Co. v. Hamilton*, 326 F.Supp. 931 (D.S.C.1971) (following *Carroway v. Johnson*, 245 S.C. 200, 139 S.E.2d 908 (1965)); *American Fid. & Casualty Co. v. Werfel*, 230 Ala. 552, 162 So. 103 (1935); *Providence Wash. Ins. Co. v. City of Valdez*, 684 P.2d 861 (Alaska 1984); *California Union Ins. Co. v. Arkansas La. Gas Co.*, 264 Ark. 449, 572 S.W.2d 393 (1978) (following *Southern Farm Bureau Casualty Ins. Co. v. Daniel*, 246 Ark. 849, 440 S.W.2d 582 (1969)); *Cedar Rapids v. Northwestern Nat'l Ins. Co.*, 304 N.W.2d 228 (Iowa 1981); *Anthony v. Frith*, 394 So.2d 867 (Miss.1981); *Colson v. Lloyd's of London*, 435 S.W.2d 42 (Mo.Ct.App.1968); *Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964); *State v. Glen Falls Ins. Co.*, 137 Vt. 313, 404 A.2d 101 (1979); *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (1985).

**9.** *See, e.g., Greenwood Cemetery, Inc. v. Travelers Indem. Co.*, 238 Ga. 313, 232 S.E.2d 910 (1977); *Mazza*, 311 N.C. 621, 319 S.E.2d 217; *Dayton Hudson Corp. v. American Mut. Liab. Ins. Co.*, 621 P.2d 1155 (Okla.1980); *Harrell v. Travelers Indem. Co.*, 279 Or. 199, 567 P.2d 1013 (1977); *Hensley v. Erie Ins. Co.*, 168 W.Va. 172, 283 S.E.2d 227 (1981); *Abbie Uriguen Olds. Buick, Inc. v. United States Fire Ins. Co.*, 95 Idaho 501, 511 P.2d 783 (1973).

**10.** *See also Jehle-Slauson Constr. Co. v. Hood-Rich, Architects & Consulting Eng'rs*, 435 So.2d 716, 720 (Ala.1983); *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 180 (Iowa 1975); *Carr v. Maryland Casualty Co.*, 88 Misc. 2d 424, 426, 388 N.Y.S.2d 196, 198 (1976); *Citron v. Hartford Accident & Indem. Co.*, 86 Misc. 2d 26, 27, 381 N.Y.S.2d 650, 651, *aff'd*, 88 Misc. 2d 902, 390 N.Y.S.2d 506 (1976), *aff'd*, 57 App. Div.2d 913, 394 N.Y.S.2d 576 (1977).

**11.** The Court would also note the *Mazza* court's observation that "the fact that a dispute arose as to the interpretation of the insurance contract, which resulted in this lawsuit, makes it apparent that the language of the policy is at best ambiguous." *Mazza*, 311 N.C. at 630, 319 S.E.2d at 223. Thus, many cases support the holding that the policy's language unambiguously provides coverage of punitive damage awards as within "damages." Others would consider the use of the term "damages" to represent an ambiguity which would call for application of the principle of *contra proferentum*. Under either analysis, defendants prevail on this issue.

**12.** Generally, the clear language of a contract controls, and a court may not consider extrinsic evidence absent some ambiguity. However, considering the effect of public policy on *this* contract does not involve extrinsic evidence since the policy at issue specifically provides that it be "automatically changed to conform to [state] law." (General Rules at 2). Therefore,

damage liability for gross negligence could be covered under a general medical malpractice policy. However, Justice Copeland specifically noted that "we emphasize at this time we neither reach nor decide the question of whether public policy prohibits one from insuring himself from the consequences of his or her *intentional* acts." *Mazza*, 311 N.C. at 626, 319 S.E.2d at 220 (emphasis added).[13] Therefore, since it involved the different policy concerns inherent in a negligence case, the holding in *Mazza* provides little, if any, guidance as to how the courts of North Carolina would decide this issue. However, the reasoning of the court is helpful.

As in *Mazza*, "[t]he issues before this Court are based on contract, thus, we must consider applicable public policy concerning *contract* rights." *Id.* at 627, 319 S.E.2d at 221 (emphasis added). Accordingly, "[a] significant public policy consideration focuses on insurance companies' obligations to honor their contracts." *Id.* However, the policy in this case specifically provided: "Any part of this policy that conflicts with state law is *automatically changed* to conform to the law." (General Rules at 2). Hence, this consideration carries less weight than it did in *Mazza*, since the contract *itself* provides for its application in accordance with North Carolina public policy.[14]

Recently, the North Carolina Supreme Court observed: "In the first instance and absent constitutional restraint, questions as to public policy are for *legislative* determination." *Gardner v. North Carolina State Bar*, 316 N.C. 285, 293, 341 S.E.2d 517, 522 (1986) (emphasis added). However, in the case before the Court, the North Carolina General Assembly has provided *no* guidance for the resolution of a question the Court can *not* avoid. In this sense, defendants ask the Court to uphold the contract *as written*. However, based upon the express reservation in *Mazza* of the issue now before this Court and the persuasive weight of authority, the Court finds that the balance of public policy concerns tips in favor of not allowing insurance coverage of punitive damages when an *intentional* tort is involved.

Like the concern for enforcing insurance contracts, the other policy considerations articulated in *Mazza* are similarly minimal when weighed against the competing interests involved in precluding coverage of punitive damages. The Supreme Court of this state has noted that "North Carolina has consistently allowed punitive damages solely on the basis of its policy [a] to *punish* intentional wrongdoing and [b] to *deter*

---

the Court must resolve the public policy question in order to determine the exact effect of the insurance contract as it relates to coverage of the punitive damage awards.

**13.** In a diversity case such as this, a court must apply state law in accordance with the case of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Hence, the Court is faced with the difficult task of *predicting* what the Supreme Court of North Carolina would decide under these facts without *any* guidance as to how it might balance the competing interests involved. Under *Erie* and its progeny, "we must nevertheless determine the rule that the North Carolina Supreme Court would probably follow, not fashion a rule which we, as an independent federal court might consider best." *Lowe's N. Wilkesboro Hardware, Inc. v. Fidelity Mut. Life Ins. Co.,* 319 F.2d 469, 472 (4th Cir.1963). Such a situation cries out for a certification statute, a procedure never implemented in this state. In fact, several of the cases uncovered by the Court's research involved questions certified by a federal district court to a state supreme court. *See, e.g., First Bank (N.A.)–Bill-*

*ings v. Transamerica Ins. Co.,* 679 P.2d 1217 (Mont.1984); *Dayton Hudson Corp.;* 621 P.2d 1155 (Okla.1980). Thus, a federal district court will determine in this case important state rights regarding an issue most appropriately resolved by the highest court of the State of North Carolina.

**14.** Specifically, the above mentioned provision ensures that plaintiff will honor its obligations *whatever* they are. In *Mazza*, the court was faced with the situation wherein the insurance company might obtain a windfall if coverage for punitives was disallowed. Such a situation would not result here because this provision provided for *automatically* modifying the contract to *conform* to state law. Hence, the Court will not have to render part of the policy *void*, as would usually be the case. This clause merely provides a limitation on the general coverage clause discussed *supra*. The Court is not implying that it would not render part of the policy void if the "automatic modification" clause were absent; it merely emphasizes that it need not reach this issue because the instant policy contains such a provision.

others from similar behavior." *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 113, 229 S.E.2d 297, 302 (1976) (citations omitted). However, as the late Senator Ervin noted, "the North Carolina Supreme Court has indicated its unwillingness to expand the doctrine beyond the limitations imposed by authoritative decisions of the court." Ervin, *Punitive Damages in North Carolina*, 59 N.C.L.Rev. 1255, 1256 (1981).

When dealing with negligence cases, a court confronts the long recognized needs for reducing financial risks of doing business and promoting economic stability. The notion of spreading the risk of punitive damages through insurance is more palatable in the arena of negligent conduct than in the arena of intentionally tortious conduct, which by definition requires the intent to cause the tortiously proscribed result with its concommitant heightened level of culpability. Accordingly, one court dealing with an intentional tort observed: "Although punitive damages may result in a windfall for the plaintiff, the primary and ultimate benefit of such damages accrues to the *community* as a whole." *Dayton Hudson Corp.*, 621 P.2d at 1158–59 (emphasis added). Hence, cases such as *Mazza* dealing with negligence cases involve totally different concerns and provide little persuasive guidance in this case.

Defendants provide a long list of cases to support their position on the public policy issue that coverage of punitive damage awards is permitted. However, upon close inspection the Court notes that most of the cases on this point deal only with damages awarded for gross negligence.[15] Thus, they provide support only for the holding in *Mazza*, not for the issue before this Court. On the other hand, a small group of cases *do* involve *intentional* torts. *See, e.g., Koehring Co. v. American Mut. Liab. Ins. Co.*, 564 F.Supp. 303 (E.D.Wis.1983) (malicious prosecution and abuse of process); *Fagot v. Ciravola*, 445 F.Supp. 342 (E.D. La.1978) (police liability); *Cedar Rapids v. Northwestern Nat'l Ins. Co.*, 304 N.W.2d 228 (Iowa 1981) (false arrest); *First Nat'l Bank v. Fidelity & Dep. Co.*, 283 Md. 228, 389 A.2d 359 (1978) (malicious prosecution); *Colson v. Lloyd's of London*, 435 S.W.2d 42 (Mo.Ct.App.1969) (false arrest); *Newark v. Hartford Accident & Indem. Co.*, 134 N.J.Super. 537, 342 A.2d 513 (1975) (police liability). However, the Court finds the holdings of these courts to not be persuasive.

Instead, the Court relies on those cases which have held that public policy precludes coverage of an award representing punitive damages.[16] Basically, the punish-

**15.** *See, e.g., Ridgway*, 578 F.2d 1026 (following *Dairyland County Mut. Ins. Co. v. Wallgren*, 477 S.W.2d 341 (Tex.Civ.App.1972)); *Ohio Casualty*, 75 F.2d 58 (applying Missouri Law); *Employers Ins. Co. v. Brock*, 233 Ala. 551, 172 So. 671 (1937); *Price v. Hartford Accident & Indem. Co.*, 108 Ariz. 485, 502 P.2d 522 (1972); *California Union*, 572 S.W.2d 393; *Whalen v. On-Deck, Inc.*, 514 A.2d 1072 (Del.1986); *Greenwood Cemetery*, 238 Ga. 313, 232 S.E.2d 910; *Travelers Indem. Co. v. Hood*, 110 Ga.App. 855, 140 S.E.2d 68 (1964); *Abbie Uriguen*, 95 Idaho 501, 511 P.2d 783; *Scott v. Instant Parking, Inc.*, 105 Ill.App.2d 133, 245 N.E.2d 124 (1969); *Continental Ins. Co. v. Hancock*, 507 S.W.2d 146 (Ky. 1973); *Anthony v. Frith*, 394 So.2d 867; *First Bank*, 679 P.2d 1217; *Mazza*, 311 N.C. 621, 319 S.E.2d 217; *Harrell*, 279 Or. 199, 567 P.2d 1013; *Morrell v. Lalonde*, 45 R.I. 112, 120 A. 435 (1923), *cert. dismissed sub nom. United States Fid. & Guar. Co. v. Morrell*, 264 U.S. 572, 44 S.Ct. 401, 68 L.Ed. 855 (1924); *Lazenby*, 214 Tenn. 639, 383 S.W.2d 1; *Glen Falls*, 137 Vt. 313, 404 A.2d 101; *Lipscombe v. Security Ins. Co.*, 213 Va. 81, 189 S.E.2d 320 (1972); *Hensley*, 168 W.Va. 172, 283 S.E.2d 227; *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677.

**16.** Most of the cases preclude coverage of punitive damages for *all* torts. *See, e.g., Hartford Life Ins. Co. v. Title Guar. Co.*, 520 F.2d 1170 (D.C.Cir.1975); *American Surety Co. v. Gold*, 375 F.2d 523 (10th Cir.1966), *followed in Koch v. Merchants Mut. Bonding Co.*, 211 Kan. 397, 507 P.2d 189 (1973); *Northwestern Nat'l Casualty Co. v. McNulty*, 307 F.2d 432 (5th Cir.1962); *Dubois v. Arkansas Valley Dredging Co.*, 651 F.Supp. 299 (W.D.La.1987) (applying the Jones Act); *Norfolk & W. Ry. v. Hartford Accident & Indem. Co.*, 420 F.Supp. 92 (N.D.Ind.1976) (negligence, but held for insured based on finding of vicarious liability), *applied in Grant*, 453 F.Supp. 1361; *American Ins. Co. v. Saulnier*, 242 F.Supp. 257 (D.Conn.1965) (following *Tedesco*, 127 Conn. 533, 18 A.2d 357); *U.S. Concrete Pipe Co. v. Bould*, 437 So.2d 1061 (Fla.1983); *Teska v. Atlantic Nat'l Ins. Co.*, 59 Misc.2d 615, 300 N.Y. S.2d 375 (1969). Others have specifically dealt with punitive damages awarded pursuant to intentional torts. *See, e.g., City Prods. Corp. v. Globe Indem. Co.*, 88 Cal.App.3d 31, 151 Cal. Rptr. 494 (2d Dist.1979) (malicious prosecution); *Dayton Hudson Corp.*, 621 P.2d 1155

ment and deterrence rationales outweigh the competing considerations and mandate that insurance policies *not* provide coverage for punitive damages when *intentional* torts are involved. If such were not the case, the insured could embark on a frolic of his own without regard to the legal consequences. Moreover, any amount paid by the insurer would be spread out among *all* its insured by way of increased premiums, thereby providing no *specific* punishment or deterrence at all. *See McNulty*, 307 F.2d at 440–42.

In accordance with the law of this circuit, this Court believes that "the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear." *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir.1987). However, the ground for "interference" in a case involving insurance coverage for punitive damages arising from intentional torts is not merely clear; it is *compelling* in that the purposes served by insurance and punitive damages are diametrically opposed. Allowing an *intentional* tortfeasor to avoid liability and spread the loss among the community at large, solely in the name of freedom of contract, defeats the dual purpose of punitive damages to punish the wrongdoer and to deter similar conduct in the future. In such a case, punitive damages would *never* possess the "sting" our tort system intends them to inflict.

(false arrest); *Esmond v. Liscio*, 209 Pa.Super. 200, 224 A.2d 793 (1966) (assault).

**17.** Basically, Appleman's position is that "[i]t is *not seemly* for insurance companies to collect premiums for risks which they voluntarily undertake, and for which they actively advertise in competition with other companies, and then when a loss arises to say 'It is against public policy for us to pay this award.' " *Id.* at 155 (emphasis added). However, as previously discussed, plaintiff in this case specifically provided that the contract conform to state law. *See supra* pp. 634–35. In other words, plaintiff *in effect* provided that it would *not* provide coverage for punitive damages awarded pursuant to intentional torts if such coverage was contrary to the public policy of North Carolina. Therefore, this argument fails to control in this case.

Most of the arguments advocating such coverage focus on this policy of favoring enforcement of an insurance contract *as written. See, e.g.,* 12 J. Appleman & J. Appleman, *Insurance Law and Practice* § 7031, at 149–55 (rev. ed. 1981).[17] However, the tort system of North Carolina has long served the full ends of justice by compensating wrongfully injured parties, punishing the wrongdoer, and deterring conduct likely to result in future harm to others. This Court does not believe that the North Carolina Supreme Court would slavishly adhere to a so-called "progressive" notion of freedom of contract which would render impotent the long standing and most efficacious tool for punishing and deterring intentional tortious conduct. Moreover, the terms of *this* contract provided for its *automatic modification* to conform to state law. Therefore, *as written*, the policy did *not* provide for coverage of punitive damages for intentional torts. Accordingly, plaintiff need only honor defendants' claims as they relate to *compensatory* damages.[18]

## CONCLUSION

1. Plaintiff is *not* liable for any of the damages awarded against defendant Prosnitz because the defamation of Dr. U did not occur within the scope of Prosnitz's duties as a physician and the fellow-employee exclusion precludes coverage of such claims.

**18.** Defendants alternatively argue that even if the Court so finds on the public policy issue, coverage of claims against Duke is still proper based upon its *vicarious* liability. *See, e.g., Norfolk & W. Ry.,* 420 F.Supp. 92; *City Prods. Corp.,* 88 Cal.App.3d 31, 151 Cal.Rptr. 494; *Dayton Hudson Corp.,* 621 P.2d 1155. In such a case, the North Carolina Supreme Court noted "that a corporation may be held liable for torts committed by its employees...." *Jones v. Gwynne,* 312 N.C. 393, 410, 323 S.E.2d 9, 19 (1984). However, the record in this case discloses that *Duke itself* committed the malicious prosecution against Dr. U. Therefore, the doctrine of respondeat superior does not apply, and public policy does not permit coverage of the punitive damages awarded against Duke for an intentional tort.

2. The insuring language of the policy covers awards representing punitive damages as well as those representing compensatory damages.

3. Plaintiff is *not* liable for the punitive damages awarded pursuant to intentional torts because the "automatic modification" provision incorporated the public policy of North Carolina that precludes coverage of punitive damages awarded pursuant to an intentional tort.

IT IS, THEREFORE, ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, GRANTED as to plaintiff's nonliability for the punitive damages awards against defendants and for all damages awarded against defendant Prosnitz.

IT IS FURTHER ORDERED that Motion of Defendants Duke University and Leonard R. Prosnitz for Partial Summary Judgment be, and the same hereby is, DENIED as to plaintiff's liability for the punitive damages awarded against defendants and for all damages awarded against defendant Prosnitz.